2019 WL 2292196
Only the Westlaw citation is currently available.
United States Court of Appeals, Fourth Circuit.

Thomas H. KRAKAUER, on behalf of a class of persons, Plaintiff – Appellee,

v.

DISH NETWORK, L.L.C., Defendant – Appellant.

DRI-The Voice of the Defense Bar;

Product Liability Advisory Council,

Incorporated, Amici Supporting Appellants.

No. 18-1518
|
Argued: May 9, 2019
|
Decided: May 30, 2019

**Synopsis**
**Background:** Consumer brought putative class action against provider of satellite television services, alleging that he had placed his telephone number on national Do-Not-Call registry and provider's individual Do-Not-Call list, but provider's sales representative had repeatedly telephoned him in violation of Telephone Consumer Protection Act (TCPA). After consumer's motion for class certification was granted, 311 F.R.D. 384, provider's motion to dismiss or, in the alternative, decertify classes was denied, 168 F.Supp.3d 843. The United States District Court for the Middle District of North Carolina, No. 1:14-cv-00333-CCE-JEP, Catherine C. Eagles, J., entered judgment upon jury verdict in favor of consumer. Provider appealed.

**Holdings:** The Court of Appeals, Wilkinson, Circuit Judge, held that:

certified class had standing to bring action for violation of the TCPA;

class certified was not overbroad;

class certified was ascertainable;

issues common to class members clearly predominated over individual issues;

provider was vicariously liable for sales representative's repeated violations of the TCPA; and

provider's willful and knowing violations of the TCPA warranted treble damages.

Affirmed.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. Catherine C. Eagles, District Judge. (1:14-cv-00333-CCE-JEP)

**Attorneys and Law Firms**

ARGUED: E. Joshua Rosenkranz, ORRICK, HERRINGTON & SUTCLIFFE, LLP, New York, New York, for Appellant. John William Barrett, BAILEY & GLASSER LLP, Charleston, West Virginia, for Appellee. ON BRIEF: Peter A. Bicks, Elyse D. Echtman, John L. Ewald, Christopher J. Cariello, New York, New York, Eric A. Shumsky, Kelsi Brown Corkran, Jeremy R. Peterman, Washington, D.C., Paul David Meyer, ORRICK, HERRINGTON & SUTCLIFFE LLP, San Francisco, California, for Appellant. Brian A. Glasser, BAILEY & GLASSER LLP, Charleston, West Virginia; Deepak Gupta, Jonathan E. Taylor, GUPTA WESSLER PLLC, Washington, D.C., for Appellee. Richard D. Kelley, BEAN KINNEY & KORMAN, Arlington, Virginia; Deirdre A. Fox, Stephanie Scharf, SCHARF BANKS MARMOR LLC, Chicago, Illinois, for Amicus Product Liability Advisory Council. David M. Axelrad, Felix Shafir, HORVITZ & LEVY LLP, Burbank, California; John F. Kuppens, President, DRI–THE VOICE OF THE DEFENSE BAR, Chicago, Illinois, for Amicus DRI–The Voice of the Defense Bar.

Before WILKINSON and KING, Circuit Judges, and Irene C. BERGER, United States District Judge for the Southern District of West Virginia, sitting by designation.

**Opinion**

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge King and Judge Berger joined.

WILKINSON, Circuit Judge:

**\*1** Congress enacted the Telephone Consumer Protection Act (TCPA) to prevent abusive telephone marketing practices. As part of this effort, the TCPA prohibits calls to numbers on the national Do-Not-Call registry. Dr. Thomas Krakauer brought suit against Dish Network, alleging that its sales representative, Satellite Systems Network (SSN), routinely flouted this prohibition. He sought to pursue his claim on behalf of all persons who, like him, had received calls on numbers listed in the Do-Not-Call registry. The district court certified the class and the case went to trial, where Dish ultimately lost. Dish now appeals, raising several objections to the proceeding below. Because we hold that the district court properly applied the law and prudently exercised its discretion, we affirm.

I.

A.

Telemarketing is big business, especially for television providers. Calls made on behalf of cable and satellite television companies have become ubiquitous. Many Americans are now accustomed to the standard sales pitch, asking them to make an upgrade or take advantage of a limited time offer. These calls are obviously effective, as consumers spend billions of dollars each year on television services marketed over the phone.

Telemarketing calls are also intrusive. A great many people object to these calls, which interfere with their lives, tie up their phone lines, and cause confusion and disruption on phone records. Faced with growing public criticism of abusive telephone marketing practices, Congress enacted the Telephone Consumer Protection Act of 1991. Pub. L. No. 102-243, 105 Stat. 2394 (1991) (codified at 47 U.S.C. § 227 (2012)). As Congress explained, the law was a response to Americans "outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers," *id.* § 2(6), and sought to strike a balance between "[i]ndividuals' privacy rights, public safety interests, and commercial freedoms," *id.* § 2(9). To meet these ends, the TCPA first imposed a number of restrictions on the use of automated telephone equipment, such as "robocalls." 47 U.S.C. § 227(b); *see Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 373, 132 S.Ct. 740, 181 L.Ed.2d 881 (2012). For in-person telemarketing calls, on the other hand, the law opted for a consumer-driven process that would allow objecting individuals to prevent unwanted calls to their homes.

The result of the telemarketing regulations was the national Do-Not-Call registry. *See* 47 C.F.R. § 64.1200(c)(2). Within the federal government's web of indecipherable acronyms and byzantine programs, the Do-Not-Call registry stands out as a model of clarity. It means what it says. If a person wishes to no longer receive telephone solicitations, he can add his number to the list. The TCPA then restricts the telephone solicitations that can be made to that number. *See id.*; 16 C.F.R. § 310.4(b)(iii)(B) ("It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to ... initiat[e] any outbound telephone call to a person when ... [t]hat person's telephone number is on the "do-not-call" registry, maintained by the Commission."). There are limited exceptions. For instance, a call does not count as a "telephone solicitation" if the caller and the recipient have an established business relationship, *see* 16 C.F.R. § 310.2(q), or if the recipient invited the call, *see* 47 U.S.C. § 227(a)(4). Barring an exception, however, telemarketers are expected to check the list and avoid bothering those who have asked to be left alone. In addition to the national registry, companies are also expected to keep individual Do-Not-Call lists, reflecting persons who have directly told the company that they do not wish to receive further solicitations. *See* 47 C.F.R. § 64.1200(d).

**\*2** The TCPA can be enforced by federal agencies, state attorneys general, and private citizens. *Mims*, 565 U.S. at 370, 132 S.Ct. 740. Relevant to this appeal, the law allows a private right of action for violations of the Do-Not-Call registry regulations. Specifically, claims can be brought by "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection ...." 47 U.S.C. § 227(c)(5). These private suits can seek either monetary or injunctive relief. *Id.* If damages are sought, the plaintiff is entitled to receive the greater of either his actual loss or statutory damages up to $ 500. *Id.* If the defendant's violation of the law was willful and knowing, those damages can be trebled, within the district court's discretion. *Id.* "[T]he court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.")

This private cause of action is a straightforward provision designed to achieve a straightforward result. Congress enacted the law to protect against invasions of privacy that were harming people. The law empowers each person to protect his own personal rights. Violations of the law are clear, as is the remedy. Put simply, the TCPA affords relief to those persons who, despite efforts to avoid it, have suffered an intrusion upon their domestic peace.

### B.

Dr. Thomas Krakauer is just such a person. In May of 2009, he started getting telemarketing calls, asking him to buy services from Dish Network. These calls were placed by a firm called Satellite Systems Network (SSN), whose entire business model was to make calls like these on behalf of television service providers. During the time that SSN was calling Krakauer, the company only marketed Dish. J.A. 172. Krakauer called Dish to complain about the calls, and he was placed on the company's individual Do-Not-Call list. Fortunately for Krakauer, he had registered his phone number on the national Do-Not-Call registry in 2003. SSN's calls to him were therefore not only annoying, they were illegal. In 2015, Krakauer sued Dish Network for the improper calls under the TCPA, seeking redress for the calls made on its behalf by SSN.

In the years since, this litigation has wound its way through an array of pre-trial motions, a full jury trial, and a detailed post-trial claims process. In September of 2015, the court certified a class that closely followed the text of the TCPA, allowing Krakauer to bring his claim on behalf all persons (1) whose numbers were on the national Do-Not-Call registry or the individual Do-Not-Call lists of either Dish or SSN for at least 30 days and (2) received two calls in a single year. J.A. 202-03. The court concluded that this definition satisfied the requirements for class certification. A few of the court's findings on this point are particularly relevant for this appeal. First, the court held that the class-wide issues raised by the plaintiffs were susceptible to common proof. *Id*. at 191, 195-96. As the court saw it, "[t]he essential elements of the class members' claim can be proven at trial with common, as opposed to individualized, evidence." J.A. 200. Looking to our court's precedents, the district court also concluded that the members of Krakauer's proposed class could be easily identified. *Id*. at 178 (citing *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) ).

Nearly a year after the initial certification, Dish moved to dismiss the entire case on the grounds that the class lacked Article III standing. The court rejected this argument, holding that "Dr. Krakauer's allegations show a concrete injury to him and to each class member," J.A. 246, and allowed the case to move forward. Prior to trial, the court granted a motion to further narrow the class in response to new class-wide data provided by the parties. *Id*. at 279-80. When the trial arrived, the court instructed the jury to resolve three factual disputes. First, the jury had to determine whether SSN was acting as Dish's agent at the time that it made the improper calls. Second, it had to determine whether SSN made, and the class members received, multiple calls to numbers on the national Do-Not-Call registry within a given period. Third, if it found that such calls were in fact made, the jury was also asked to assign a damages award for each improper call. *Id*. at 510-28.

**\*3** Ultimately, the jury returned a verdict in favor of Krakauer and the class plaintiffs. After finding that the telemarketing practices violated the TCPA and that Dish was liable for the calls placed by SSN, the jury awarded damages of $ 400 per call. *Id*. at 508. Once the trial was complete, the district court examined whether Dish's violations were willful and knowing, as provided for in the statute. The court found that they were, and trebled the damages award. *Id*. at 549-50. Dish responded with a motion for a new trial and renewed motion for judgment as a matter of law, raising many of the arguments that had been rejected at the class certification stage and in its earlier motions. All of these arguments were rejected, and the court began to process the class members' claims.

In developing a process to ensure that the money went to the right people, the parties presented wildly divergent proposals to the court. Dish asked the court to require a claims form for every single class member, even those for whom the class-wide evidence clearly established a valid claim. The plaintiffs on the other hand, asked for judgment to be entered immediately and for checks to be mailed to class members who had already responded to the class solicitation, without the need for adversarial process. J.A. 615-16.

The court opted for a middle position, declining to enter an immediate judgment and instead allowing Dish to participate in the process and contest some individual claims. *Id.* at 626. Under this process, the court would appoint an administrator to oversee the distribution and completion of individual claims forms. The court left open the possibility that the plaintiffs could point to "class members who are identified fully and without contradiction in the data," for whom judgment without a claims form would be appropriate. *Id.* at 628. Applying this method, the district court granted judgment for approximately 11,000 plaintiffs without a claims form, finding that their entitlement to damages was clear. J.A. 671.

Many months later, and more than a year after the jury trial had concluded, the district court entered a final judgment in the case.[1] In entering the order, the district court noted that Dish had not participated in the claims process in good faith, instead choosing to "bombard the court with irrelevant and voluminous materials," "repeat arguments the court has rejected many times," and "seek a second bite at the apple when it loses on grounds it could have raised the first time the apple was presented." J.A. 685. Given the futility of continuing a process that was only initiated to give Dish a seat at the table, the court "conclude[d] that the time ha[d] come to enter judgment in favor of the class." *Id.* The judgment totaled more than $ 61,000,000. *Id.* at 685-86.

**\*4** It is at this point, prior to the complete disbursement of the funds, that this case arrives on appeal. Through each stage of the proceedings below, the record reflects substantial diligence and care by the district court in managing the class. When new evidence became available, the court modified the class appropriately. When Dish raised new arguments or rehashed old ones, the court thoroughly responded, carefully parsing the legal authorities that were presented. When the parties offered competing positions on how to handle the claims process, the court opted for the path that afforded Dish a chance to participate, and carefully scrutinized the plaintiffs' motions to ensure that purported class members did not recover without sufficient support for their claims.

Dish's contentions on appeal come in three varieties. First, it challenges the class certification on the grounds that the court lacks jurisdiction over the class under Article III. Second, it raises various objections to the district court's certification of the class as a matter of civil procedure. And third, it challenges its own liability for the improper calls placed by SSN.

II.

As is customary, we first take up Dish's jurisdictional argument. As Dish sees the matter, Article III bars the court from certifying a class if the class is defined such that many members of the class will lack standing. The question of how to handle classes that may include uninjured class members has received considerable attention among our sister circuits in recent years. *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 56-57 (1st Cir. 2018) (collecting cases). As these thoughtful opinions demonstrate, this question can be seen as implicating either the jurisdiction of the court under Article III or the procedural issues embedded within Rule 23's requirements for class certification. At times, the discussion of these two issues has run together. We are of the view, however, that to the extent Article III imposes distinct constraints on the composition of the class, that issue ought to be taken up separately. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 830-831, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999).

Turning to the standing question alone, the class certified by the district court is entirely consonant with Article III's requirements. The class definition hewed tightly to the language of the TCPA's cause of action, and that statute itself recognizes a cognizable constitutional injury. There is therefore no untold number of class members who lack standing here, and we need not expound on what it would mean if there were.

To fall within the class certified below, a person had to receive two calls within one year to a number that was listed on the Do-Not-Call registry, just as the TCPA provides. J.A. 80. The question for us is whether this class definition, by its terms, stated an injury that is sufficient to support federal jurisdiction. The Supreme Court's recent decision in *Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S. Ct. 1540, 194 L.Ed.2d 635 (2016), provides the answer. *Spokeo* lays down a few clear propositions. First, the traditional requirements of standing—injury-in-fact, redressability, and traceability—apply to causes of action created by statute. Congress's determination that a cause of action exists does not displace this

"irreducible constitutional minimum" of standing. *Id.* at 1547-48 ("Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." (quoting *Raines v. Byrd*, 521 U.S. 811, 820 n.3, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) ). Second, for an injury-in-fact to be cognizable under the Constitution, it must be both concrete and particularized. *Id.* at 1548-49. And third, in determining whether a given injury meets the constitutional threshold, we look to both historic practice and the judgment of Congress. *Id.*

**\*5** Taken together, this guidance helps to preserve the traditional core of standing, which is a personal stake in the case. Private litigation, even if authorized by statute to serve a range of public ends, must vindicate the plaintiffs' interests, rather than serve solely a vehicle for ensuring legal compliance. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) ("Were the federal courts merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding, the concept of 'standing' would be quite unnecessary."). This is just as true of class actions as it is for any other "case" or "controversy" in federal court. *See Warth v. Seldin*, 422 U.S. 490, 498-99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975).

Looking both to Congress's judgment and historical practice, as *Spokeo* instructs, the private right of action here plainly satisfies the demands of Article III. In enacting § 227(c)(5) of the TCPA, Congress responded to the harms of actual people by creating a cause of action that protects their particular and concrete privacy interests. To bring suit, the plaintiffs here must have received unwanted calls on multiple occasions. These calls must have been to a residential number listed on the Do-Not-Call registry. This is not a statute authorizing citizen-suits for any legal violation to which a plaintiff might take issue. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 571-72, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citing 16 U.S.C. § 1540(g)). The statute requires that an individual receive a call on his own residential number, a call that he previously took steps to avoid. There is nothing ethereal or abstract about it.

Our legal traditions, moreover, have long protected privacy interests in the home. Intrusions upon personal privacy were recognized in tort law and redressable through private litigation. *See generally* Restatement (Second) of Torts, § 652B (defining "[i]ntrusion upon seclusion" as "intentional[ ] intru[sion], physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns"). Cognizable intrusions include intrusions made via phone calls. *Id.* The straightforward application of *Spokeo* thus neatly resolves this matter, as many other courts have held in similar settings. *See Susinno v. Work Out World Inc.*, 862 F.3d 346, 351-52 (3d Cir. 2017); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017); *Booth v. Appstack, Inc.*, 2016 WL 3030256, at \*5-6 (W.D. Wash. May 25, 2016) (holding that under *Spokeo* violations of the TCPA's robocalling provision are "sufficiently concrete to confer standing"); *Mey v. Got Warranty, Inc.*, 193 F. Supp. 3d 641 (N.D. W. Va. 2016) ("[U]nwanted phone calls cause concrete harm.").

The arguments to the contrary, made by both the appellant and its amici, deploy *Spokeo* in ways that go well beyond its holding and rationale. Rather than paying heed to Congress's judgment of what sort of particular and concrete harms ought to count, the appellants ask that we import the elements of common law torts, piece by piece, into any scheme Congress may devise. As they see it, Article III's injury-in-fact requirement is not met until the plaintiff's alleged harm has risen to a level that would support a common law cause of action. This sort of judicial grafting is not what *Spokeo* had in mind. *See Susinno*, 862 F.3d at 352. Our inquiry is focused on types of harms protected at common law, not the precise point at which those harms become actionable. Congress is empowered to "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law," *Spokeo*, 136 S. Ct. at 1549 (citing *Lujan*, 504 U.S. at 578, 112 S.Ct. 2130), and that is precisely what it did here.

**\*6** The plaintiffs here do not seek redress for a procedural shortcoming, such as the defendant's failure to keep accurate Do-Not-Call records. Their claim under § 227(c)(5) accrues only once a telemarketer disregards the registry and actually places multiple calls. Since that harm is both particular to each person and imposes a concrete burden on his privacy, it is sufficient to confer standing. The appellant's suggestion otherwise is nothing more than an attempt to dismember the TCPA, converting a simple remedial scheme into a fact-intensive quarrel over how

long a party was on the line or how irritated it felt when the phone rang. Obviously, Congress could have created such a cumbersome scheme if it wanted to. It instead opted for a more straightforward and manageable way of protecting personal privacy, and the Constitution in no way bars it from doing so.

### III.

We now take up the various challenges to the plaintiffs' class under Rule 23. See Fed. R. Civ. P. 23. At the time of the trial, the class was defined to include:

> [1] All persons throughout the United States whose telephone numbers were listed on the federal Do Not Call registry for at least 30 days, but [2] who received telemarketing calls from SSN to promote the sale of Dish satellite television subscriptions [3] from May 1, 2010 to August 1, 2011.

J.A. 80.[2] Our review of class certification issues is deferential, cognizant of both the considerable advantages that our district court colleagues possess in managing complex litigation and the need to afford them some latitude in bringing that expertise to bear. See Doe v. Chao, 306 F.3d 170, 183 (4th Cir. 2002). In seeking class certification under Rule 23, the plaintiff has the burden of demonstrating that the requirements for class-wide adjudication have been met. See Comcast Corp. v. Behrend, 569 U.S. 27, 33, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013). Since the requirements of Rule 23 are often "enmeshed in the factual and legal issues comprising the plaintiffs' cause of action," Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011) (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) ), the district court must rigorously examine the core issues of the case at the certification stage.

Rule 23 begins with a list of threshold requirements applicable to all class actions, commonly referred to as "numerosity," "commonality," "typicality," and "adequacy." See Fed. R. Civ. P. 23(a). These "four requirements ... 'effectively limit the class claims to those fairly encompassed by the named plaintiff's claims.' " Wal-Mart Stores, 564 U.S. at 349, 131 S.Ct. 2541 (quoting Gen. Tel. Co. of Sw., 457 U.S. at 156, 102 S.Ct. 2364). We have also noted that, apart from the enumerated requirements, "Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.' " EQT Prod. Co., 764 F.3d at 358 (quoting Hammond v. Powell, 462 F.2d 1053, 1055 (4th Cir. 1972) ). Under this principle, sometimes called "ascertainability," "a class cannot be certified unless a court can readily identify the class members in reference to objective criteria." Id.

Once these showings have been made, the plaintiff then bears the burden of demonstrating that the proposed class fits into one of the specific forms of class adjudication provided by Rule 23(b). See Ortiz, 527 U.S. at 833, 119 S.Ct. 2295. The provision relevant here is Rule 23(b)(3), which is the common vehicle for "mass tort class actions," which seek damages for widespread wrongful conduct. See Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 424 (4th Cir. 2003). Unlike other forms of class actions, Rule 23(b)(3) requires notice to class members, who are afforded an opportunity to opt-out of the class at the certification stage. See Fed. R. Civ. P. 23(c)(2); 3 William Rubenstein et al., Newberg on Class Actions, § 8:1 (5th ed. 2018). The rule is "designed to secure judgments binding all class members save those who affirmatively elected to be excluded." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 614-15, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

*7 To obtain certification under 23(b)(3), the plaintiff must show both that "[1] questions of law and fact common to class members predominate over any questions affecting only individual class members, and [2] that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The two requirements are unsurprisingly labeled "predominance" and "superiority." Since claims aggregated under Rule 23(b)(3) can be resolved without the class mechanism, these requirements ensure that a class action is only used when it makes sense.

### A.

The application of Rule 23 often turns on the cause of action. *See, e.g.*, *Erica P. John Fund, Inc. v. Halliburton*, 563 U.S. 804, 809, 131 S.Ct. 2179, 180 L.Ed.2d 24 (2011). As a general matter, the limits of Rule 23 are designed to ensure vigorous adversarial process, efficient adjudication of class-wide questions, and a practical means of identifying and notifying those who may be affected by a judgment. Each of these issues is inextricably linked with the elements of a particular claim. A cause of action that includes a fact-bound element or a claim-specific affirmative defense may be less susceptible to class treatment than one that does not. Efficient and manageable classes require common proof, and the availability of such proof turns on what exactly needs to be proven. We therefore begin our analysis by looking to the particular cause of action created by the TPCA.

The private right of action in § 227(c)(5) offers many advantages for class-wide adjudication. It requires a plaintiff to initially show two things: a number on the Do-Not-Call registry, and two calls made to that number in a year. The damages, moreover, can be set at any amount up to $ 500 without any actual proof of loss. Other relevant issues, such as the existence of a business relationship between the solicitor and the recipient of the call, are likely to be proven by records kept by the defendant company. The problems that so often plague class actions under Rule 23(b)(3) are wholly absent from this scheme. The liability determinations involve no questions of individual reliance, *see, e.g.*, *Erica P. John Fund*, 563 U.S. at 810-11, 131 S.Ct. 2179, no complicated contractual obligations, *see, e.g.*, *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 779 (8th Cir. 2013), and no theories of probabilistic injury, *see, e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, ––– U.S. ––––, 136 S. Ct. 1036, 1045-46, 194 L.Ed.2d 124 (2016). The damages calculations do not turn on individual evidence, *see, e.g.*, *In re Asacol Antitrust Litig.*, 907 F.3d at 52-53, nor are they difficult to connect to the underlying harm, *see, e.g.*, *Comcast*, 569 U.S. at 35-38, 133 S.Ct. 1426. Put simply, a plaintiff suing under § 227(c)(5) is likely to be in the same position as a great many other people and can rely largely on common proof to make out his claim.

Given the remedial purpose of the TCPA, it is no surprise that its cause of action would be conducive to class-wide disposition. In enacting the law, Congress sought to deter an activity that, while pernicious and disruptive, does not trigger extensive liability in any single case. Since few individuals would have an incentive to bring suit, no matter how frustrated they were with the intrusion on their privacy, the TCPA opted for a model that allows for resolution of issues without extensive individual complications.

B.

Since the TCPA clearly supports class-wide resolution in the abstract, we now consider whether the statute supports this class in particular. Once again, the district court certified a class definition that hewed closely to the TCPA's text, allowing Krakauer to sue on behalf of all "persons" who "received" violative calls during the class period. J.A. 80. Dish nonetheless asserts that this definition is overbroad. Despite the fact that the relevant definition of the class is pulled directly from the statute, Dish argues that the class necessarily includes a large number of people who have no statutory claim at all. As Dish sees it, the TCPA's private cause of action for violations of the Do-Not-Call registry can only be brought by telephone *subscribers*, meaning chiefly the individuals who are "responsible for the payment of the telephone bill," 47 C.F.R. § 64.1100(h), rather than any *person* who received an improper call.

**\*8** We see no basis for imposing such a limit. The question of who can sue under a statutory cause of action turns on whether the party is within the statute's "zone of interests." *Lexmark Int'l., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-30, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014). If a plaintiff is the sort of person the law intended to protect, he can press his claim. To determine if a plaintiff is within the "zone of interests," we simply look to the statute itself. Accordingly, applying this test requires nothing more than "traditional principles of statutory interpretation," such that "the outcome will rise and fall on the meaning of the Congressionally enacted provision creating [the] cause of action." *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 708 (4th Cir. 2016) (quoting *Lexmark*, 572 U.S. at 128, 134 S.Ct. 1377).

"Traditional principles of statutory interpretation" leave no doubt as to the right answer here. The private right of action allows suit by any "person" who "received" calls that were placed "in violation of" the TCPA regulations. 47 U.S.C. § 227(c)(5). Its coverage is clear, as are its limits. The text of the TCPA notes that it was intended to protect "consumers," not simply "subscribers," who

were "outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers." Pub. L. No. 102-243, § 2(6). It protects these persons from "[u]nrestricted telemarketing," which "can be an intrusive invasion of privacy." *Id.* § 2(5). A non-subscriber who receives a call can suffer a privacy intrusion just as easily as a subscriber can. The extensive legislative history accompanying the TCPA confirms its broad reach. *See Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 325-26 (3d Cir. 2015) (interpreting the TCPA's robocalling cause of action).

The text, purpose, and history all cut against reading the statute as protecting only subscribers. It is highly unlikely that, in the face of such strong evidence supporting the plain text, that Congress would expect us to infer otherwise. Dish's proposed limit of the class to subscribers is even more dubious when one considers that Congress specifically referenced "subscribers" in other parts of the TCPA, *see, e.g.*, 47 U.S.C. § 227(f)(2), but did not do so here. We assume that Congress chooses its words carefully and does not lightly toss around broad language ("persons") when more precise language ("subscribers") is available. As such, we hold that the cause of action is § 227(c)(5) is not limited to telephone subscribers.

In response, Dish points us toward decisions interpreting a range of other federal statutes, none of which bear much resemblance to § 227(c)(5). Dish is surely correct that, as a general matter, the "zone of interests" framework is useful for identifying important limits on a cause of action which may not be expressly stated in the law. It is especially important when the cause of action's plain text does not supply meaningful constraints. Does a cause of action, for example, include competitors? *See Assoc. of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Is it available only to those with harm to their commercial interests, or also those with other sorts of injuries? *See Lexmark*, 572 U.S. at 132, 134 S.Ct. 1377. The TCPA, however, does not leave such questions open. The statute marks its own boundary. Suit can only be brought by those who receive multiple violative calls. Calls are only violative if the phone number was on the Do-Not-Call registry. And a number can only be placed on such a registry if the number is a residential line. Whatever work we may be required to do for more broadly worded statutes, Congress did the work for us here.

**\*9** Finally, Dish argues that the private right of action in § 227(c)(5) must be limited to "subscribers" because it is telephone subscribers who can list their phone numbers on the national Do-Not-Call registry. *See* 47 C.F.R. § 64.1200(c)(2). In the face of clear text pointing the other way, however, we see no reason that the private right of action should be limited only to those who can list their numbers on the registry. If a wife, as the subscriber, lists a home telephone number on the Do-Not-Call registry, but her husband happens to be the one who receives the improper calls, the law has still been violated. Both the wife and the husband can suffer the harm that Congress sought to deter, and both are "persons" able to bring a claim under § 227(c)(5).

C.

With the statute properly in view, the appellant's challenge to this class falls away. Appellant's core argument seems to be that this class includes a large number of uninjured persons. Other courts to address the question of uninjured plaintiffs have done so through the lens of predominance, asking whether the differences among the class members are so great that individual adjudication subsumes the class-wide issues. *See In re Asacol Antitrust Litig.*, 907 F.3d at 51-53; *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244 (D.C. Cir. 2013); *Kleen Prods. v. Int'l Paper Co.*, 831 F.3d 919 (7th Cir. 2016). For its part, the district court took up the issue through the lens of ascertainability. Regardless of which approach is used, the issue has no bearing on this case. Because the private right of action is not as narrow as Dish and its amici suggest, there is simply not a large number of uninjured persons included within the plaintiffs' class.

With this red herring cast aside, the class certified by the district court easily meets the demands of Rule 23. First, the class members are ascertainable. As we previously explained, class litigation should not move forward when a court cannot identify class members without "extensive and individualized fact-finding or 'mini-trials.' " *EQT Prod. Co.*, 764 F.3d at 358. The goal is not to "identify every class member at the time of certification," *id.*, but to define a class in such a way as to ensure that there will be some "administratively feasible [way] for the court to determine whether a particular individual is a member" at some point. *Id.* (quoting 7A Charles Alan Wright et al., Federal Practice and Procedure, § 1760 (3d ed. 2005)).

The class-wide data obviated any concern on this score. The records in this case clearly showed when calls were placed and whether the call went through. The court was presented with data showing whether a number was residential and connecting the number to particular names and addresses. J.A. 179-80. The class members could therefore be identified on a large-scale basis, and notified of the class action accordingly.

Second, the issues common to the plaintiffs clearly predominated over individual issues. The predominance inquiry "calls upon courts to give careful scrutiny to the relation between common and individual questions in the case." *Tyson Foods*, 136 S. Ct. at 1045. The entire notion of predominance implies that the plaintiffs' claims need not be identical, and, as the Supreme Court has noted, a class can meet this requirement "even though other important matters will have to be tried separately." *Id.* (quoting 7AA Charles Alan Wright et al., Federal Practice and Procedure, § 1778 (3d ed. 2005)).

As the trial court thoroughly documented when certifying the class, all of the major issues in the case could be shown through aggregate records. As the above discussion demonstrates, class-wide records were produced regarding when calls were made, whether they went through to the residence, and to which numbers they were directed. The facts that were relevant to Dish's liability were also common to the class. The plaintiffs argued that SSN was acting as Dish's agent at the time it made the improper calls. This was a question that in all likelihood was common to the class. And perhaps most significantly, the plaintiffs sought a statutory damages award, preventing the need to measure individual compensatory damages. See *In re Asacol Antitrust Litig.*, 907 F.3d at 51-53.

 **\*10**  While Dish objected to various aspects of the plaintiffs' proposed data and argued that individual fact-finding would be required, the district court considered these arguments and found them unpersuasive. J.A. 192-98. For some of these issues, such as whether a phone number was residential or commercial, Dish was unable to show any significant error in the aggregate data offered by the plaintiffs. For other issues, such as whether the telemarketer had an existing business relationship with the person who was called, it would be reasonable to expect Dish to keep business records, which would themselves be relevant to the entire class. J.A. 196.

At bottom, the advantages of class resolution follow directly from the statute. The statute creates a simple scheme for determining if a violation occurred, whether a defense is available, and what the damages ought to be. The district court faithfully applied the statute when certifying this class. Because its determinations were reasonable, there is no error for us to correct.[3]

Much like their arguments on standing, Dish and its amici devote a great deal of attention to the larger debates that are swirling around class certification. The question of how best to handle uninjured class members has led to well-reasoned opinions from our sister circuits. Were we empowered to issue advisory opinions, we might have something useful to contribute to the discussion. A litigated case is not a symposium, however, and whatever views we may have on these issues must be left for another day. The actual plaintiffs in this case can satisfy the requirements of class certification under well-settled and broadly accepted principles. Anyone looking for some grand pronouncement of law in this case has simply picked the wrong horse.

IV.

The final thrust of Dish's appeal concerns its own liability. Dish does not contest that widespread violations of the TCPA occurred, nor does it dispute that these violations were made for the sole purpose of selling Dish services. Dish does not even seriously contest that it knew of the violative conduct. Instead, it challenges both the jury's finding that it is liable for SSN's conduct and the district court's separate determination that Dish's violations of the law were knowing and willful.

Both arguments fail, and for the same reason: Dish characterizes what are essentially factual disagreements as questions of law, thereby failing to appreciate the substantial deference owed to the careful findings made in the proceeding below.

A.

We first consider whether Dish was properly held liable for the calls that SSN made to members of the class. The jury concluded that it was because SSN was acting

as Dish's agent when the calls were made. By its plain language, the TCPA's private right of action contemplates that a company can be held liable for calls made on its behalf, even if not placed by the company directly. *See* 47 U.S.C. § 227(c)(5) (authorizing claims by "[a] person who has received more than one telephone call within any 12-month period *by or on behalf of* the same entity" (emphasis added)). While we have no clear definition of "on behalf of" in the TCPA, we may, at a minimum, assume that federal statutes are written with familiar common law agency principles in mind. *See Meyer v. Holley*, 537 U.S. 280, 285-86, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003).

**\*11** Under traditional agency law, an agency relationship exists when a principal "manifests assent" to an agent "that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *See* Restatement (Third) of Agency, § 1.01. Once such a relationship is formed, "traditional vicarious liability rules ordinarily make principals ... vicariously liable for acts of their agents ... in the scope of their authority." *Meyer*, 537 U.S. at 285-86, 123 S.Ct. 824 (collecting cases). "Generally, the existence and scope of agency relationships are factual matters," and are therefore often appropriately left to the jury. *Metco Products, Inc., Div. of Case Mfg. Co. v. NLRB*, 884 F.2d 156, 159 (4th Cir. 1989).

This settled law was clearly spelled out in the jury instructions. The jury was asked to find whether or not SSN was Dish's agent at the time it made the calls relevant to this case. J.A. 508. If the jury had answered that question in the negative, that would have ended the matter. The court carefully explained that Krakauer had the burden of showing such a relationship, and that the relationship required mutual assent and control by Dish. J.A. 514-15. The court also instructed the jury on the scope of authority. Specifically, the court instructed the jury how to assess a situation, as we have here, wherein the principal's guidance to the agent may not be explicit, but instead arises from the principal's acquiescence to a course of conduct. J.A. 515-16. As the district court explained, "to decide whether the principal acquiesced or consented, you must find that the principal knew of prior similar activities and consented or did not object to them." J.A. 516.

In sum, the district court interpreted the statute to apply standard legal principles. The question was then presented to the jury, which ultimately held Dish liable. Despite Dish's assertions that the district court somehow engaged in legal errors on this point, its challenges bottom out on no more than a disagreement about the facts.

And to prevail on the facts, Dish must show that the jury's conclusion lacks any meaningful support, viewing "the trial evidence in the light most favorable to the prevailing party." *See Roe v. Howard*, 917 F.3d 229, 231 (4th Cir. 2019). Dish has fallen far short of clearing that bar. The evidence supporting an agency relationship between Dish and SSN is considerable. First, there are the many provisions of the contract between Dish and SSN affording Dish broad authority over SSN's business, including what technology it used and what records it retained. J.A. 584. Second, SSN was authorized to use Dish's name and logo in carrying out its operation. Third, the jury had before it the Voluntary Compliance Agreement that Dish entered into with 46 state attorneys general, wherein Dish clearly stated its authority over SSN with regard to TCPA compliance. And on the issue of whether SSN was acting within the scope of its authority, an array of witnesses testified that Dish was aware of SSN's legal violations, took no meaningful action to ensure compliance, and profited from SSN's actions. Faced with this evidence, it was entirely reasonable for the jury to conclude both that SSN was acting as Dish's agent, and that SSN was acting pursuant to its authority when making the calls at issue in this case.

Dish offers two arguments in response. First, it contends that its contract with SSN, which expressly defined the relationship between the parties, ought to outweigh the evidence on the ground. It is a familiar rule of agency, however, that parties cannot avoid the legal obligations of agency by simply contracting out of them. *See* Restatement (Third) of Agency, § 1.02 ("Whether a relationship is characterized as agency in an agreement between the parties ... is not controlling."). Agency law, including a principal's liability for acts done on his behalf, protects third parties, who themselves would receive no protection from a contractual disclaimer. This case demonstrates the need to look beyond the contract, as a failure to do so might lead to absolving a company, like Dish, that acquiesced in and benefitted from a wrongful course of conduct that was carried out on its behalf.

**\*12** Parties are of course still free to enter into contracts establishing independent contractor relationships, which,

among other advantages, allow large firms to take advantage of the expertise of smaller companies. The terms of the agreement between the firms will remain highly relevant to the legal status of their relationship. At no time, however, have we suggested that a contractual disclaimer was alone dispositive. *See Robb v. United States*, 80 F.3d 884, 893 n.11 (4th Cir. 1996). If the parties want the benefits of an independent contractor relationship, they have to actually have one. Dish wanted to exercise extensive control over SSN's conduct without taking on responsibility for that conduct, and that is what the law does not permit.

Second, Dish argues that because it occasionally instructed SSN to follow the law, no reasonable jury could conclude that SSN's improper telemarketing calls were done within the scope of SSN's authority as Dish's agent. Dish does not dispute that a principal can be liable for the illegal acts of an agent. Nor does it dispute that the acts of an agent can be within the scope of authority even when no express direction is given by the principal. The jury was properly instructed on these points and presented with evidence showing that Dish knew of SSN's statutory violations and its failure to comply with Dish's purported instructions. The evidence also showed that Dish failed to respond to these concerns in any serious way and was profiting handsomely from SSN's sales tactics. It may be that Dish believes that its warnings and admonitions should have been given greater weight by the jury. Because the jury resolved this question and had extensive evidentiary support for its conclusion, it does not matter whether Dish now believes its argument to be convincing. Dish had its chance to persuade the jury, and it lost.

### B.

The TPCA authorizes a district court, at its discretion, to treble the jury's damages award if it finds that the defendant's violations of the law were "willful[ ] and knowing[ ]." 47 U.S.C. § 227(c)(5). After the jury found Dish liable for the telemarketing violations here, the district court trebled the damages under this provision. Examining the jury's findings, the court found both that the willful and knowing standard had been satisfied and that an increased award was needed "to deter Dish from future violations and ... give appropriate weight to the scope of the violations." J.A. 576. There is no basis, either with regards to the legal standard or the facts, for disturbing this conclusion on appeal.

We begin with the law. The court identified two alternative and independent bases for finding Dish's conduct to be "willful" and "knowing." The first was derived from traditional agency law. As the district court explained, it is a familiar principle of agency that "a principal is liable for the willful acts of his agent committed within the scope of the agent's actual authority." J.A. 570 (citing Restatement (Third) of Agency § 7.04). The second was grounded in Dish's own conduct, apart from the agency relationship. In articulating the standard applicable to Dish's actions standing alone, the court rightly acknowledged that mere negligence would not be enough to support trebling the award. Instead, Dish would only be liable if its actions demonstrated indifference to ongoing violations and a conscious disregard for compliance with the law. *Id.* at 571 (citing *United States v. Blankenship*, 846 F.3d 663, 673 (4th Cir. 2017) ). This is a familiar willfulness standard that is common to many areas of law. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007) ("[W]here willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well.").

**\*13** Turning to the facts, there is ample support for each of the district court's rationales in the record produced at trial. The court carefully parsed the trial evidence, noting which evidence it relied on and which it did not. J.A. 553. Assessments of credibility were thoroughly explained. *Id.* On the first rationale, which imputed SSN's liability to Dish, the district court leaned heavily on the factual findings of the jury. The jury found that SSN was acting as Dish's agent when it made the calls in violation of the TCPA. It also found that this conduct was within the scope of SSN's authority as an agent of Dish. As set forth above, both of these findings were entirely appropriate. The court then assessed each of Dish's arguments against willfulness, rightly noting that many of these were little more attempts to absolve itself of legal liability by pointing to contractual terms and pro forma notices. In doing so, the court found that Dish's instructions to SSN were no more than "empty words" that obscured the true relationship between Dish and its retailer. J.A. 571.

Similarly, the second rationale, based on Dish's own willful conduct, was firmly supported by the evidence.

The court documented the many occasions on which Dish noted SSN's noncompliance and failed to act. The trial court catalogued the lawsuits and enforcement actions brought against Dish for telemarketing activities, none of which prompted the company to seriously improve its business practices: "While Dish promised forty-six state attorneys general in 2009 that it would enforce TCPA compliance by its marketers, Dish did nothing to monitor, much less enforce, SSN's compliance with the telemarketing laws. When it learned of SSN's noncompliance, Dish repeatedly looked the other way." J.A. 549.

The district court also noted the half-hearted way in which Dish responded to consumer complaints, finding that the "evidence shows that Dish cared about stopping complaints, not about achieving TCPA compliance." J.A. 573. The court then assessed Dish's arguments to the contrary, finding that its refrain that it knew nothing of SSN's widespread violations was simply not credible: "Given the tens of thousands of violative calls SSN made in a span of just over a year, even a cursory investigation or monitoring effort by Dish would have uncovered the violations. Under these circumstances, what Dish calls a mistaken belief is actually willful ignorance." J.A. 574-75.

Stripped of their labels, Dish's arguments against treble damages are simply reassertions of those that were rejected elsewhere. Dish seems to think that so long as it includes certain language in a contract or issues the occasional perfunctory warning to a retailer the court will not look past the formalities and examine the actual control exercised by Dish. Moreover, Dish fails to recognize that repeated expressions of ignorance as to a widespread problem can evince more than simply negligence; they can also be a sign that the violations are known, tolerated, and even encouraged. Trebling is never to be done lightly. Given the consequences for a company, a trebled award must rest on solid evidence. Here there was.

## V.

The TCPA was enacted to solve a problem. Simply put, people felt almost helpless in the face of repeated and unwanted telemarketing calls. S. Rep. No. 102-178, at 1-2 (1991). Congress responded with an Act that featured a combination of public and private enforcement, allowing suits both to enjoin intrusive practices and deter future violations through money damages. The features of the private right of action in § 227(c)(5), whether statutory damages or strict liability, evince an intent by Congress to allow consumers to bring their claims at modest personal expense. These same features also make TCPA claims amenable to class action resolution. Dish's arguments, if accepted, would contort a simple and administrable statute into one that is both burdensome and toothless. It would be dispiriting beyond belief if courts defeated Congress' obvious attempt to vindicate the public interest with interpretations that ignored the purpose, text, and structure of this Act at the behest of those whose abusive practices the legislative branch had meant to curb.

**\*14** This will not happen. Class adjudication is complicated, and getting it right requires a careful parsing of the claims and the evidence from the start. It also requires striking a balance between efficient administration and fairness to all those affected, whether they be the class members, the defendants, or absent parties who are nonetheless bound by the judgment. The proceedings below reflected just the measured and thorough approach that we might hope for in such demanding situations. For the foregoing reasons, the judgment is

*AFFIRMED.*

**All Citations**

--- F.3d ----, 2019 WL 2292196

---

Footnotes

1   We have jurisdiction over this appeal under 28 U.S.C. § 1291, which affords this court jurisdiction to review "final decisions of the district courts of the United States." The final judgment of April 5, 2018 fully describes the 18,066 class members, reflects the jury's verdict as to both liability and damages, and includes an aggregate damages award of $ 61,243,800. J.A. 687. All that remains at the district court are "questions as to distribution of the damages award [that] can be resolved expeditiously and easily via a claims process." *Id.* at 686.

|   |   |
|---|---|
|   | In such a situation, where the remaining issues are "ministerial" and unlikely to alter the issues on appeal, "immediate appeal is allowed." *Parks v. Pavkovic*, 753 F.2d 1397, 1401 (7th Cir. 1985). *See also Barfield v. Sho-Me Power Elec. Coop.*, 309 F.R.D. 491 (W.D. Mo. 2015) *vacated on other grounds*, 852 F.3d 795 (8th Cir. 2017). The Supreme Court has exercised jurisdiction in an identical posture, where judgment was entered after trial, but before all of the funds were disbursed to class plaintiffs. *See Tyson Foods, Inc. v. Bouaphakeo*, ––– U.S. ––––, 136 S. Ct. 1036, 1050, 194 L.Ed.2d 124 (2016). |
| 2 | The class certified by the district court initially included those whose numbers were listed on the individual companies' Do-Not-Call lists. By the time of trial, the class was narrowed to focus on only those numbers listed on the national Do-Not-Call registry. |
| 3 | We similarly see no error in the district court's jury instructions. The court instructed the jury to determine whether SSN made two calls to the same number on the Do-Not-Call registry within a single year. J.A. 517-18. The court left the question of whether particular names and addresses matched those numbers to the post-trial claims process. This was appropriate. The jury heard evidence on whether the calls were placed and decided that question, which was common to the class. The court was within its discretion to allow the jury to resolve only the class-wide issues, while reserving individual claims disputes for later down the line. |

**End of Document**                                                                 © 2019 Thomson Reuters. No claim to original U.S. Government Works.